Filed 2/6/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br>Plaintiff and Respondent,<br>v.<br>M.A.,<br>Defendant and Appellant. | A165424<br><br>(Solano County Super. Ct. No. J45321) |

M.A. (Father) appeals from the juvenile court's detention, jurisdiction, and disposition orders in this dependency proceeding regarding his four-year-old son, M.C. (Minor). Father contends that (1) the juvenile court erred in detaining Minor from Father's custody; (2) there was insufficient evidence to support the jurisdictional allegation against Father; (3) there was insufficient evidence to support the disposition orders removing Minor from Father's custody; and (4) the reunification services ordered for Father were unsupported by the evidence.

We affirm the orders regarding detention and jurisdiction, but we must reverse the disposition order. California law requires that the Solano County Health and Social Services Department (the Department) establish by *clear and convincing evidence* that placing Minor with Father "would be

detrimental to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code, § 361.2, subd. (a).)[1] The record here lacked substantial evidence to support such a finding. The juvenile court also abused its discretion by ordering Father to engage in reunification services recommended by the Department—substance abuse testing, completion of a parenting class, and participation in a parent partner program—without any factual basis to support such an order. The record lacks any evidence that Father uses or abuses narcotics or alcohol, and reflects that Father co-parented three children of his prior marriage, all now adults.

## BACKGROUND

### A. *Petition and Detention*

In 2021, Minor's mother (Mother) gave birth to Minor's half brother. Mother tested positive for methamphetamines and marijuana at the hospital after childbirth, triggering a referral to the Department. According to the Department's initial report, Mother abandoned the newborn at the hospital, purportedly eloping with the newborn's putative father. Then three-year-old Minor's whereabouts were unknown.

The Department contacted Father two days after the delivery of the newborn. Minor's birth certificate had identified a different man as Minor's parent, but a DNA test had confirmed that Father was indeed Minor's biological parent. Father is a professional truck driver, and he was in Michigan when he received the Department's call. Father reported he had left Minor with Mother approximately four days prior. Father explained that Minor lived with Mother and maternal grandmother, but before going to the hospital to deliver her newborn, Mother left Minor in the care of a family

---

[1] Unless otherwise noted, further statutory references are to the Welfare and Institutions Code.

friend. The family friend considered Minor like a "biological grandson," though she had learned that Father (and not her own son) is Minor's biological father.

The Department confirmed that Minor was safe in the family friend's custody. The friend expressed concern that Minor was not safe in Mother's custody, and that everyone in Mother's home "does 'hard drugs' such as methamphetamines." She stated that Father was "always on the road for work and does not care for [Minor]." The next day, the family friend reported that Mother had "snatched" Minor from her house overnight. The friend did not have Mother's contact information.

Father reported that Mother "used to do methamphetamines in the past," but could not verify whether she was currently using methamphetamines. The Department had received two prior referrals for Minor. The Department received the first referral in 2018, when Minor was born, because Mother tested positive for amphetamines and marijuana. This referral was deemed "inconclusive" because Mother entered a residential treatment program. In 2019, the Department received a second referral based on a report that Mother had threatened to sell Minor for $20,000. This referral was deemed "inconclusive" because Father took custody of Minor.

Father had cared for Minor for several months in 2019 when Mother was using methamphetamines and alcohol, but Mother resumed caring for Minor after she "got sober" in 2020. Father offered to make arrangements for Minor to be with his paternal grandfather until Father returned to California.

The Department filed a petition alleging Minor was within the jurisdiction of the juvenile court because he was at substantial risk of serious harm due to Mother's ongoing substance abuse. (§ 300, subd. (b)(1).) The

Department also alleged Minor was at risk because Father "knew or reasonably should have known [Mother] was continuing to use methamphetamines and marijuana during her pregnancy" and left Minor with her "without a safety plan for [Minor's] care." The Department further alleged that Minor's older half sibling (not related to Father) was adjudged as a dependent of the court in 2012. Mother's parental rights were terminated in 2014. (*Id.*, subd. (j).)

At the detention hearing in August 2021, Father's counsel "enter[ed] a denial on his behalf." The juvenile court found the Department made a prima facie case that Minor came within section 300 and that continuance in parental custody was contrary to his welfare. The court found there was a substantial danger to Minor's physical or emotional health, and there were no reasonable means to protect his health absent removal. The court ordered Minor detained. The Department placed Minor in an emergency foster home, and moved him to a resource family home shortly thereafter, with his infant half brother.

### B. *Jurisdiction and Disposition*

#### 1. Initial Findings Regarding Jurisdiction

In its October 2021 jurisdiction/disposition report, the Department recommended that the juvenile court sustain the allegations against both Mother and Father, order the continued detention of Minor, elevate Father from "alleged" to "presumed" parent status,[2] and offer reunification services

---

[2] Dependency law distinguishes between "alleged," "biological," and "presumed" fathers, which determines the extent to which the father may participate in the proceedings and be entitled to certain rights. (*In re Mia M.* (2022) 75 Cal.App.5th 792, 806.) An "alleged" father has not established biological paternity or qualification as a "presumed" father under the Uniform Parentage Act (Fam. Code, § 7600 et seq.). Presumptions of

to Father. Mother's whereabouts remained unknown, and she had not been in contact with the Department.

The Department confirmed that Father's positive DNA test results were legitimate and unaltered. Father reported that he had left Minor in Mother's care back in August because he "felt he didn't have another option" as he regularly traveled for work. Father had adult children from a prior marriage; there was no child welfare history and no history of personal substance abuse. If reunified with Minor, Father reported that his aunt and uncle had agreed to help care for Minor while Father was traveling for work. The Department nevertheless recommended reunification services for Father as part of the case plan, including a Department-approved parenting education course and submission to random substance abuse testing by the Department.

### 2. The Contested Jurisdiction and Disposition Hearing

The juvenile court held a contested jurisdiction and disposition hearing in April 2022. At the beginning of the hearing, Father's counsel requested either that the case be closed and Minor returned to Father's custody, or that Minor be placed with Father on a "family maintenance" program. The Department's counsel then expressed her understanding that Father was either "submitting or objecting and submitting on jurisdiction with [Father's] counsel wanting to make a statement for the record, but that really today's contesting hearing is limited to the issue of whether [Father] received family

---

parenthood are set forth under this statutory framework, and a "presumed parent" includes a person who "receives the child into their home and openly holds out the child as their natural child." (Fam. Code, § 7611, subd. (d).) A "presumed" father is entitled to reunification services, whereas a "biological" father *may* receive such services if the court determines that it will benefit the child. (*In re Mia M.* at p. 806; § 361.5, subd. (a).)

reunification or family maintenance services or whether the court is going to place the child in his care and close the case." Father's counsel responded that they were "going to submit on jurisdiction, but we are going to be arguing that he was the noncustodial parent" and that the law was "clear that the court must place a child with a noncustodial parent, absent finding of detriment."

Father testified that he still worked as a professional truck driver and, with his current rotation schedule, spent five nights away and then three nights at home. Father had prepared a plan with Minor's paternal great-aunt and great-uncle for Minor to live at their home and for them to take care of Minor while Father was on the road. Father said he had completed a virtual parenting class identified by the Department, but had not received a certificate. The social worker told him that she would verify it. Father testified that, back in August, he had left Minor with Mother because it seemed to him that she was not using drugs. Further, the maternal grandmother had told him Mother was not using drugs or drinking alcohol.

Father's ex-wife also testified on his behalf. She testified that she had three children with Father, and that Father "has always been on top of everything in regards to his children since they were born." She had also seen Father with Minor, and they had a "[v]ery good" relationship. She testified that despite "all his defects," Father "is a good father," loves Minor, and is attentive and responsible with him. She also testified that she was friends with the paternal great-aunt. Father's former spouse had agreed that she would be there to help if there was an emergency or the paternal great-aunt and great-uncle needed help with Minor.

The social services supervisor (who had been the social worker assigned to the case) testified that the case presented an unusual situation because

Father was offered weekly visitation but, given the nature of his work and proposed plan to rely on other family members to help care for Minor, the Department permitted other paternal relatives to visit even when Father was unable to attend. In the supervisor's view, visitation had been inconsistent. In the past five months, Father had attended five visits, Minor's paternal great-uncle had attended six visits, and Minor's paternal great-aunt had attended two visits. Father's 19-year-old daughter (Minor's adult half sister) visited the most regularly.

Minor's paternal great-aunt and great-uncle were going through the resource family approval process. The required background checks had not yet occurred, which the Department characterized as a "barrier" to current placement of Minor in their home. The approval process for the anticipated home was in progress but the home had not yet passed the Department's inspection. The supervisor testified that the paternal great-aunt and great-uncle were only Spanish-speaking. While Minor knew some common words in Spanish, he spoke only English and could not converse in Spanish.

The supervisor testified that reunification services were recommended because the Department had not seen a "behavioral change in [Father's] ability to show that he can safely care for [Minor]." In her view, Father "placed the child in unsafe situations. He's made unsafe plans and arrangements for caregivers due to work, and I haven't seen him demonstrate his willingness to make sure the child's needs come first." When asked what opportunities Father had been given to demonstrate a positive behavioral change, the supervisor testified that he was provided a "parent partner" (someone to provide peer support who had been through the child welfare system and reunified with their children), but Father was unable to participate because he could not schedule regular weekly appointments due

to his rotating work schedule. She also testified that Father had not completed a parenting education class. When asked how the Department envisioned the reunification plan for Father, the supervisor testified that she would like Father to "get back engaged with a parent partner," complete the parenting class, and "be able to verbalize on how he plans on meeting his child's needs when he is parenting from afar[.]"

**3. The Juvenile Court's Findings**

The juvenile court declared Father to be Minor's presumed parent. The court found true the allegations under section 300, subdivisions (b)(1) and (j), including the allegation that Father knew or reasonably should have known Minor's mother was continuing to use drugs during her pregnancy, and left Minor in her care without a safety plan.

The court checked the box on the form order after hearing, finding: "By clear and convincing evidence, placement with the following parent would be detrimental to the safety, protection, or physical or emotional well-being of the child: Presumed father." The court's comments on the record at the conclusion of the hearing, however, did not mention the bases for these findings nor the burden of proof.

Instead, the juvenile court primarily discussed the court's future expectations of Father. The court indicated some concern that Father had not complied with tasks the Department had set out for him, like completing parenting classes. The court said, "I've heard what I've heard today . . . so far and what I've read in the file. But it seems to me we have a father that wants to be a father. Okay. That's a good thing, and that's good from the Department's standpoint, from everybody's standpoint. The problem is [the Department has] set up these different rules for [Father] after the events with the mother, and he's attempted to follow them, but he hasn't really done

everything he should. Maybe he has, maybe he's gone to the parenting, I don't know."

The court next expressed that Father and Father's family could have visited Minor more frequently. While the family members had visited Minor, "it wasn't really a lot" and "there really hasn't been a lot of contact in four years" since Minor was born. The court noted that Father's adult daughter was Minor's most frequent contact with Father's relatives, but it was unclear whether she would be a potential caretaker for Minor.

The Department had characterized Father as "historically unfortunately put[ting] his job over the needs of his child," because his work as a truck driver "requires him to be gone for lengthy periods of time." The court urged Father to try harder. The court continued, "So, I just think you make a big effort." Regarding Father's job as a truck driver, the court said, "If you have the power to limit those routes but, if you're making that kind of money, I can't see stopping. You just keep going. You do your routes. You have five days. You have two great days with your son, and it all works out."

The court referred again to the fact that Father had left Minor with Mother so he could work in the days leading up to the Department's intervention. The Department speculated that Father might have known Mother was using methamphetamines. The court said, "But I really think you need this little investigation. I agree it's not the strongest case that we've seen in this type of cases, I don't think it's the weakest either. I think he made some mistakes, but placing the child back with her after I heard about her and what I read about her was not a smart thing."

The court also expressed some concern about potential uncertainty regarding the logistics of Minor returning to Father's care. The Department had argued Father's plan was not "viable" because it was unclear which of

several possible rooms at Father's aunt and uncle's house would ultimately become Minor's bedroom. The court said, "And the room, if it is the other room, so be it, I guess. But we don't know. There's not enough for me. My interest is the child right now. My interest is you. Everybody says you're a good father, even your ex-wife, notwithstanding . . . in spite of all his faults. I've heard that a lot. So, anyhow, we just need a little time, and my feeling would be that the recommendations of the Department are well taken at this time."

Going forward, the court expected Father "does his job. Make a good living. Gets a place so he has a rent[al] if that ever ends, but at least he has a place to go, and the fact that the home that doesn't concern me too much other than, you know, this is what people have to do now with the economics of the situation." The court wanted Father "to just follow the rules to a tee." "And on this you're putting your son first, your job second, but the thing you can do with your son now is the visitation and follow up any of the rules that have to be done. Let the relatives be investigated and hopefully in six months or calendar it before, if it's all done everybody recommends it, you can get what you wanted here today. But that will be the order of the court." It found that Minor's out-of-home placement was appropriate and necessary.

The court ordered reunification services for Father as stated in the Department's case plan. It maintained visitation for Father and his family and permitted video visitation for Father given his work schedule. The court did not discuss the basis for its order as to reunification services.

This appeal followed.

## DISCUSSION

### I. No Error in Detention

Father argues that the juvenile court erred in its original 2021 findings and orders by detaining Minor from Father's custody. The Department initially responds that Father has forfeited this challenge because his notice of appeal identifies the 2022 jurisdiction and disposition orders, but not the 2021 detention orders.

Father has not forfeited his right to appeal the detention orders. "An order entered prior to disposition . . . is 'interlocutory and not appealable, and thus any issue pertaining to it must be raised in a timely appeal of the dispositional order.' " (*In re B.P.* (2020) 49 Cal.App.5th 886, 889 [dismissing appeal from non-appealable detention order, quoting *In re Javier G.* (2005) 130 Cal.App.4th 1195, 1200].) That is precisely what Father did here, appealing from the order on disposition and raising arguments regarding detention and jurisdiction. The California Rules of Court require that a notice of appeal be liberally construed " 'so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.' " (*In re Joshua S.* (2007) 41 Cal.4th 261, 272; Cal. Rules of Court, rule 8.821(a)(2).) The Department has not argued any prejudice here. Given these circumstances and that Father had to raise his challenge with an appeal of the dispositional order, we construe the notice of appeal to include an appeal of the August 2021 detention findings and orders.

We nonetheless conclude that Father's argument fails on the merits. Section 319, subdivision (c)(1) provides that a minor's detention must be supported by a prima facie showing that the child falls within section 300. The Department argues that section 319, subdivision (c)(1) does not apply to

Father because he had only "alleged" father status at the time of detention and was not a "parent" within the meaning of section 319. (See, e.g. *In re J.W.-P.* (2020) 54 Cal.App.5th 298, 301 ["alleged" fathers have fewer rights and are not entitled to custody].) Father offers no authority to the contrary.

Section 300 is satisfied where the court finds that remaining in the parent's home is contrary to the child's welfare, there is a "substantial danger" to the physical health of the child, and there are no "reasonable means" by which to protect the child's health unless the child is removed from the parent's custody. The juvenile court properly found section 300 satisfied as to Mother, given her ongoing drug abuse and her abandonment of her newborn, Minor's half brother, almost immediately after giving birth.

Even if section 319, subdivision (c)(1) did apply to Father, we are not persuaded that the juvenile court erred. The Department's evidentiary burden at the *detention* hearing is "light." (*Johnny W. v. Superior Court* (2017) 9 Cal.App.5th 559, 567.) The record reflects ample evidence that Minor was in serious danger. Father reported that he had left Minor with Mother, despite her history of substance abuse. While Father said he did not know Mother was using drugs when he left Minor with her to go to work, the juvenile court knew Mother had tested positive for methamphetamine and marijuana use and had abandoned her newborn at the hospital shortly after giving birth to him. She then suddenly reappeared to "snatch" Minor from the family friend who had been watching him while Mother was preparing to deliver her baby. The juvenile court can consider Father's prior parenting decisions to determine whether Minor needs the court's protection. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) The court did not err in finding the Minor in danger at this early stage.

Father also argues that the Department failed to make "reasonable efforts" to prevent Minor's removal from his custody, suggesting that the Department should not have detained Minor and instead waited until the following week when Father returned to California. Again, we disagree. "A reasonable efforts finding must be based on the particular circumstances of the case." (*In re Amy M.* (1991) 232 Cal.App.3d 849, 856.) The Department accurately characterizes the situation in this case, at the time of the detention hearing, as "emergent." No one knew Minor's whereabouts at the time the Department filed the petition, Mother had disappeared after a failed drug test, and Mother then reappeared to take Minor from the family friend who had been watching him. Meanwhile, Father was driving a truck over 2,000 miles away and unable to immediately return to take custody of the Minor. Under the circumstances, waiting a week before detaining the then three-year-old Minor would have been manifestly unreasonable. The juvenile court did not err in its "reasonable efforts" finding.

Finally, Father argues that even if detention was proper, the court erred in failing to consider placement with Minor's paternal grandfather. Section 319, subdivision (f)(3) provides that if a child cannot be returned to the physical custody of their parent, the court "shall determine if there is a relative who is able and willing to care for the child, and has been assessed pursuant to Section 361.4."

Again, at the time of the detention hearing, Father was still an "alleged" parent; he lacked a putative father's rights under the Uniform Parentage Act and section 319, subdivision (f)(3) did not yet apply to him. Even if it did, the paternal grandfather had not been "assessed" pursuant to section 361.4, which typically includes an in-home inspection, criminal records check, and child welfare history check. (§ 361.4, subd. (a)(1)–(3).)

Under the circumstances, the juvenile court did not err in determining at the detention hearing there was no relative who satisfied the definition of section 319, subdivision (f)(3).

## II. Substantial Evidence for Jurisdictional Allegation

Father argues that the juvenile court's jurisdictional finding against him is not supported by substantial evidence. (§ 300, subd. (b)(1).) The Department initially responds that Father either waived this challenge by submitting on jurisdiction at the April 2022 hearing, or that the challenge is nonjusticiable because the jurisdictional finding against *Mother* was sufficient to support the order.

We are not persuaded that the record shows an unequivocal waiver of Father's challenge. The decision *In re Ricardo L.* (2003) 109 Cal.App.4th 552 is instructive. There, the father's counsel represented he was " 'going to submit on the jurisdiction.' " (*Id.* at p. 565.) When read in context, however, it was apparent that counsel "was submitting the matter based on the jurisdictional/dispositional report, not the recommendations." (*Ibid.*) "Such a submission acted as consent to allow the court to consider the report as the only evidence in determining whether the allegations in the petition were true." (*Ibid.*) It did not preclude the father from appealing to challenge the sufficiency of the evidence on the jurisdictional finding. (*Id.* at pp. 565–566.) Similarly, here, there is some indication that Father may have been "objecting and submitting" on jurisdiction. Father's counsel stated that he was "going to submit on jurisdiction," but nonetheless requested that the case either be *closed* or, alternatively, proceed with family maintenance services. On this record, we cannot conclude that Father waived his challenge.

We turn next to the justiciability of this challenge. "Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction

may exist based on the conduct of one parent only." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) "As a result, we need not consider jurisdictional findings based on the other parent's conduct." (*Ibid.*) Father requests, however, that we nonetheless consider the jurisdictional finding against him. We retain the discretion to consider the merits of a parent's appeal where, as here, "the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal." (*Ibid.*) We will exercise our discretion to do so.

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) Father bears the burden on appeal to show that the evidence was not sufficient to support the finding. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) Substantial evidence "means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case.' " (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.)

Father argues that there was insufficient evidence to support the jurisdictional allegation against him here. Section 300, subdivision (b)(1) allows the juvenile court to take jurisdiction over a child when there is "a substantial risk that the child will suffer serious physical harm or illness, as a result of" the parent's "failure or inability . . . to adequately supervise or

protect the child," or "[t]he willful or negligent failure" of the parent "to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." (§ 300, subd. (b)(1)(A), (B).) Father contends there was no evidence establishing that he "knew or reasonably should have known" Mother was continuing to use methamphetamines and marijuana and that he left Minor in her care without a safety plan. We disagree.

As detailed above, Father left Minor with Mother despite knowing her troubled history of substance abuse. Father could not tell the Department where Minor was, could not say whether Mother was currently using drugs, and could not immediately return home to take custody of Minor if he could even find Minor. Father did not know whether the family friend who cared for Minor, and who apparently considered herself akin to Minor's biological grandmother, did so on a regular basis or for long periods of time. There was also evidence that this ignorance was not limited to the specific incident triggering the referral: Father reported that when he was away for work, he would "try" to contact Mother to inquire about Minor, but Mother would often not answer his calls. It is reasonable to conclude that, had Father been a more consistent parental presence, he would have known about Mother's substance use. For example, the family friend expressed immediate concern to the Department that Minor was not safe in Mother's custody because she believed everyone in Mother's home "does 'hard drugs' such as methamphetamines."

Father also argues that, even assuming he should have known about Mother's drug use, there was no evidence that he would have failed to protect Minor from Mother at the time of the jurisdictional hearing. Substantial evidence remains, however, that Minor was at risk based on Father's decision

to leave Minor in the care of someone Father reasonably should have known was using drugs. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.) Father reported that he had previously cared for Minor in 2019 when Mother was using drugs and alcohol, but then returned Minor to her care when she achieved sobriety in 2020. As detailed above, Father was not diligent in ensuring that Minor was not at risk from a relapse by Mother. Father has not satisfied his burden on appeal to show the juvenile court's section 300, subdivision (b)(1) jurisdictional finding against him was not supported by substantial evidence.

**III. No Substantial Evidence for Disposition**

We conclude that the juvenile court erred in its dispositional findings. The court had appropriately found Father a putative parent, triggering an important set of rights. Before ordering the removal of a child at the disposition stage, the juvenile court must "first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) "If that parent requests custody, the court *shall* place the child with the parent *unless* it finds that placement with that parent would be *detrimental to the safety, protection, or physical or emotional well-being of the child*." (*Ibid.*, italics added.)

California law places a heightened burden of proof on the Department—not the parent—in connection with the finding of detriment. " ' " 'Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood.' [Citation.] 'In furtherance of these principles, the courts have imposed a standard of *clear and convincing* proof of parental inability to provide proper

care for the child and resulting detriment to the child if it remains with the parent, before custody can be awarded to a nonparent.' " ' " (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) In making a finding of detriment, the juvenile court weighs all relevant factors to determine if the child will suffer net harm. (*Id.* at p. 700.) On appeal, "[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard*." (*Id.* at p. 694.)

Father argues that there was insufficient evidence to support the court's finding of detriment and removal of Minor from his custody. Father highlights his remote employment, the proposed living arrangement with other caregivers, and Father's lack of personal substance abuse issues, which the juvenile court rejected as a basis for detriment.

The juvenile court provided very little by way of explanation concerning how it reached its finding of detriment. To the extent we can discern any specific findings of fact that might support the required showing, the juvenile court again mentioned Father's earlier decision to leave Minor with Mother before she gave birth to Minor's half brother. At the April 2022 hearing, however, Father had repeatedly expressed his desire to take full custody of Minor and his understanding of the dangers posed by Mother's addiction. Given all that had transpired, there is no indication that the juvenile court believed Father would give Minor back to Mother absent a court order requiring him to do so.

Rather, the court focused on its expectations for Father's future behavior. The court stated that it would "follow the recommendations" of the Department. Those recommendations included required drug testing and

completion of a parenting class (if he had not already done so). The Department also wanted Father to provide a very specific plan for exactly where Minor would sleep, articulate exactly which family members would care for Minor while Father was driving, explain how family members who do not speak English would interact with Minor (who is not conversant in Spanish), and for Father and his family members to visit more with Minor. Father must follow the rules "to a tee," the court urged. "It's like you got to stop at the line, you got to stop at the [bus] stations, wherever you have to do it, you got to do it."

Father objects that his inability to visit with the Minor as frequently as the Department would have permitted him is not evidence that placing him in Father's care would be detrimental to Minor's safety, protection, or physical or emotional well-being. Compliance with rules imposed by the Department or the juvenile court can certainly support a finding that leaving a child with a parent would not be detrimental to the child's well-being. (Cf. *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 772 [granting writ petition from order setting permanency planning hearing because father "did virtually everything the [Orange County Social Services Agency] requested of him" and "has shown consistent dedication to her welfare and their reunification"].) Father accurately notes, however, that it appears like the juvenile court flipped the burden of proof. To regain custody, despite the lack of evidence regarding detriment, the juvenile court effectively required Father to show he and his family visited with Minor enough to satisfy the Department's unwritten standards, and to articulate detailed plans for how Father will care for Minor while Father is working. The plan could not be to leave Minor alone or to have Mother care for him, but Father, of course, never suggested either of those possibilities. Instead, Father presented a credible

though potentially challenging approach to the work-parenting balance that would enlist the help of his Spanish-speaking aunt and uncle.

Care plans to address remote working parents are almost always less than ideal, and a language barrier between a child and his or her caregiver may present challenges. The law, however, does not take a child away from a parent based on a less than ideal situation during a parent's working hours or because of language barriers. (Cf. *In re Isayah C.*, *supra*, 118 Cal.App.4th at p. 697 [determination of detriment should still recognize parent's general right to make "reasonable decisions about where and with whom the child will reside"].) Moreover, the record indicates the Minor may have attachment issues due to "his history of interruption in caregivers." The Department expressed concern about Minor's transition to preschool. The court did not discuss this evidence. If anything, it would seem to support a conclusion that Minor would benefit from a more rapid resolution of the issue of custody, followed by therapeutic services, rather than have him maintain ongoing ties to his foster caregivers.

Lost in the juvenile court's discussion of compliance with the Department's rules "to a tee" is the fact that Father is Minor's father. California law presumes that a child ought to be with a parent rather than in the foster system absent clear and convincing evidence that keeping the child with the parent would be detrimental to the child's safety, protection, or physical or emotional well-being. (§ 361.2, subd. (a).) We conclude there was insufficient evidence to support the juvenile court's finding of detriment on disposition.

### IV. Abuse of Discretion on Reunification Services

The case plan is "the foundation and central unifying tool in child welfare services" and is prepared by the Department to ensure that "services

are provided to the child and parents" to "facilitate the safe return of the child to a safe home." (§ 16501.1, subd. (a)(1)–(2).) A reunification case plan has several components, including the identification of specific goals and the appropriateness of planned services in meeting those goals. (*Id.*, subd. (g)(2).)

We review the juvenile court's disposition case plan for abuse of discretion. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.) "When the court orders a parent to participate in a program—such as parent education, counseling, parenting programs, etc.—the program must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' " (*In re M.R.* (2020) 48 Cal.App.5th 412, 424.) "In other words, the court cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child." (*Ibid.*)

Father contends that a parenting education class should not have been included in his case plan because he has already taken the class. It is entirely unclear why a parenting class would benefit Minor or Father given that Father had already parented his three now-adult children and his ex-wife testified that Father "has always been on top of everything in regards to his children since they were born." But given Father's position that he has already completed the class, we conclude that the error in ordering a parenting class was harmless. (*In re M.R.*, *supra*, 48 Cal.App.5th at p. 429 [applying harmless error analysis to claim regarding case plan].) Father does not suggest that his participation could not be confirmed, only that he did not yet have written confirmation.

More troubling is the juvenile court's order that Father submit to substance abuse testing. There was no evidence that Father had substance abuse issues. "A 'mechanical approach' to a reunification plan is not what the

Legislature intended: '[s]uch a plan must be appropriate for each family and be based on the unique facts relating to that family.' " (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.) At the hearing, no one testified that Father was using narcotics or abusing alcohol.

The Department posits that the drug testing order was within the court's discretion because "[i]t was clear that [Father] had some sort of impairment (internal or substance induced) that caused him to be unable and/or unwilling to see that Mother was using drugs again and/or an unsafe person for [Minor]." Alternatively, the Department suggests that drug testing would somehow sensitize Father to Mother's addiction. These arguments are unsupported by any evidence. The evidence showed that Father had no prior or current substance abuse issues and his decision to leave Minor with Mother was based on the fact that Father drove a truck for a living. No one explained to the juvenile court (or to us) why subjecting someone who does not have a substance abuse problem to a drug test would help that person better understand the perils of substance abuse. The inclusion of substance abuse testing in Father's reunification case plan constituted an abuse of discretion.

Lastly, Father disputes any requirement that he participate in the parent partner program. While this program was not an explicit item in the written case plan, Father argues that the Department nonetheless used it against him at the disposition hearing and indicated that it would be used to measure his subsequent performance for reunification.

Father's point is well taken. When asked about how Father had failed to demonstrate a behavioral change, the social services supervisor testified that he had not participated in the parent partner program. When asked how the Department envisioned the reunification plan for Father, the

supervisor testified that she would like Father to "get back engaged with a parent partner." But the program was not appropriately tailored to the circumstances of this family. (*In re Dino E.*, *supra*, 6 Cal.App.4th at p. 1777.) Father himself inquired about whether he could participate in the program remotely and in a manner that would work with his rotating schedule. The Department was unable to accommodate such arrangements. We conclude that any inclusion of participation in the parent partner program in Father's reunification case plan also constituted an abuse of discretion.

**DISPOSITION**

The April 25, 2022 disposition order is reversed to the extent it made findings under section 361.2 that lacked substantial evidence, and to the extent it ordered Father to submit to substance abuse testing and participate in a parent partner program. The orders are affirmed in all other respects. The matter is remanded to the juvenile court with directions to: (1) vacate its dispositional findings under section 361.2 as to Father and its order for Father to participate in the reunification services stated in the case plan; (2) set a continued dispositional hearing at the earliest appropriate time; (3) direct the Department to prepare a supplemental disposition report; and (4) make such further orders as the court deems necessary and appropriate, consistent with this opinion. At the continued dispositional hearing, in the absence of new developments that would warrant otherwise or further and different evidence to support a finding of detriment by clear and convincing evidence, the juvenile court is directed to order placement of Minor with Father as required by section 361.2, subdivision (a).

Markman, J.*

We concur:

Richman, Acting P.J.

Miller, J.

*In re M.A.* (A165424)

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Solano County Superior Court |
| Trial Judge: | Hon. William C. Harrison |
| Attorney for Defendant and Appellant: | Appointed by Court of Appeal<br>First District Appellate Project<br>Danley Law, PLLC<br>Michelle E. Danley |
| Attorneys for Plaintiff and Respondent: | Office of Solano County Counsel<br>Bernadette S. Curry<br>County Counsel<br><br>Carrie Blacklock<br>Assistant County Counsel<br><br>Clarisa P. Sudarma<br>Deputy County Counsel |